**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

UNITED STATES OF AMERICA,                                    CASE NO.  1:14cr107-1

        Plaintiff,

    -vs-                                                         Michael R. Barrett, Judge

NICDARRYLONDO CREW, et al.

        Defendants.

**OPINION AND ORDER**

This matter came on for Defendant Nicdarrylondo Crew's ("Crew") Motion to Suppress re: Search of Defendant's Text Messages Location Information and other Documents Associated with Cellular Number 513-727-0547 (Doc. 198) and the Government's Response (Doc. 205); Crew's Motion to Suppress Evidence Seized from Renee Court Residence (Doc. 199) and the Government's Response (Doc. 206); and, Crew's Motion to Suppress Evidence Seized from Kenshire Residence (Doc. 200) and the Government's Response (Doc. 207).  The parties submitted the issues regarding the cellular phone number and the Kenshire residence on the pleadings and the Affidavits in Support of Search Warrants (Doc. 202, Filed Under Seal).  Testimonial evidence and exhibits were presented on the Renee Court issue.

## I.    BACKGROUND FACTS

FBI Special Agent Chris Giordano was in charge of the investigation of the Defendants herein.  The investigation commenced in or about October 2013 and involved surveillance, physical evidence, administratively obtained content, and the use of confidential sources to develop the information eventually propounded in the various

affidavits for search warrants issued on October 18, 2013 regarding the cellular phone number ending in 0547 (Doc. 202-8; Doc. 202-9), on January 14, 2014 regarding the cellular phone number ending in 0547 (Doc. 202-11), on October 20, 2014 regarding the residence at 11350 Kenshire Drive (Doc. 202-1), and on October 21, 2014 regarding the residence at 5869 Renee Court (Doc. 202-4).  These documents were filed under seal (Doc. 202) in support of Crew's motions to suppress.

Defense counsel argues that the lynchpin of their defense, as it relates to Crew, is the search warrants and applications for information associated with the cellular phone number ending in 0547.  In those affidavits, the authoring agent sets forth, in detail, his training, background and experience in narcotics investigations and related physical and electronic surveillance.  (Doc. 202-8, PageId 738-40; Doc. 202-9, PageId 758-60).  The agent further relates that his investigation is linked with gang activity in the Southern District of Ohio and, specifically, the Cincinnati area, and he describes various gang activity monitored by the FBI, DEA and Cincinnati Police Department. (Doc 202-8, PageId 741-47; Doc. 202-9, PageId 761-65).  In addition to identifying other targets, the agent relays information from a source that Crew has been dealing in controlled substances from Chicago.  (Doc. 202-8, PageId 743; Doc. 202-9, PageId 762).  This information comes through a cooperating witness and confidential human sources that are considered reliable by the Cincinnati Police Department and the FBI. (Doc. 202-8, PageId 742-43; Doc. 202-9, PageId 762-63).

Confidential Human Source No. 1 provided information for sentence/case consideration on his own behalf, and his information on previous investigations has been corroborated through various techniques.  (Doc. 202-8, PageId 743-74; Doc. 202-

9, PageId 762-63). This informant indicated that Crew and co-defendants were large heroin and cocaine traffickers, now focusing mostly on heroin. He provided agents with the targeted cellular phone number from Crew and indicated that Crew had a Mexican drug connection. (Doc. 202-8, PageId 743; Doc. 202-9, PageId 762-63). Having developed information from the confidential informant and shared information between the FBI, CPD and DEA, administrative subpoenas were issued to Cincinnati Bell and Verizon on October 9, 2013 regarding the targeted cell phone, which the agent determined to reveal a fictitious account. That is, in response to the administrative subpoena on October 9, 2013, the phone number check of the targeted cellular phone indicated a subscriber's name other than Crew. Therefore, this name and address were determined to be fictitious. (Doc. 202-8, PageId 744; Doc.202-9, PageId 763-64). This prepaid cell service is of the type often used by narcotic traffickers. The pre-paid system makes it difficult to identify or verify the users. (Doc. 202-8, PageId 744; Doc. 202-9, PageId 764).

On October 18, 2013, agents obtained a warrant for the GPS tracking of the targeted cell phone allowing agents, by November 1, 2013, to track and trace the cellular phone ending in 0547, which eventually led to the 11350 Kenshire Drive residence in Cincinnati, Ohio. (Doc. 202-9, PageId 755-70; Doc. 202-11, PageId 802). Surveillance of that address resulted in the identification of two vehicles associated with Crew and the determination that the cell phone number in question was in Crew's possession. (Doc. 202-11, PageId 802).

Also on October 18, 2013, a search warrant authorized the obtainment of text messages stored on the target cell phone. (Doc. 202-8). Upon review of those

messages, agents deciphered the code wherein Crew tells co-conspirator Pride that he is meeting with "his people." (Doc. 202-11, PageId 802). After this meeting with Crew, Pride contacted him and informed him, in code, based upon help from the confidential human source, that the message referred to quantities of cocaine powder. (Doc. 202-11, PageId 802-03).

In November and December of 2013, pen registers and trap trace orders were authorized for Crew's and Pride's numbers. (*See* Doc. 202-11, PageId 803). In mid-December, agents discovered that Crew stopped using the targeted cell phone. (Id.). By examining co-conspirator Pride's phones and one of Crew's girlfriends' phones, agents determined that Crew had switched to a new number. (Id.). Between the time of the initial warrant and December 12, 2013, Crew and Pride had 373 contacts on the targeted cell phone, many of which agents determination, again through the help of a confidential human source, to be narcotics related. (Id.). Agents determined that 11350 Kenshire Drive, Cincinnati, Ohio, was the residence of Crew and Jamicka Love, believed to be one of Crew's girlfriends. (Doc. 202-1, PageId 672).

After obtaining a warrant for Crew's cell phone, agents were able to analyze the texts to determine conversations involving the transfer of controlled substances between the suspects. Thereafter, and having received information from Tennessee State Police regarding Crew, agents identified Brittany Snow as a female acquaintance of Crew with an address of 5869 Renee Court, Apt. 7, Cincinnati, Ohio. (Doc. 202-1, PageId 682). Through continued surveillance, agents determined that address to be a meeting place for the various suspects. (Doc. 202-8, PageId 682). Agents testified that closely monitored physical activity evolved into a pattern of behavior that lead to the

stop of an alleged co-conspirator. On February 4, 2014, agents observed people entering Crew's Kenshire Drive residence empty-handed and leaving Crew's Kenshire Drive residence with plastic bags. (Doc. 202-1, PageId 679-80). Agents followed the suspect after leaving the Kenshire Drive residence, and observed an exchange with an individual in a truck. (Id., PageId 679). A subsequent stop of a truck produced $80,000.00 in cash. (Id.).

Thereafter, agents continued their surveillance and interception of communications. (Doc. 202-1, PageId 680-94). On September 27, 2014, intercepted communications indicated a resupply of narcotics. (Id., PageId 686-87). The location data for Crew at the time of the initial communication placed him at the Kenshire Drive residence. (Id., PageId 687-88). Additional intercepted communications on October 6, 2014 through October 8, 2014 referenced what agents believed to be narcotics transactions. (Id., PageId 688-91). On October 7, 2014, consistent with intercepted communications, Crew was observed leaving the Kenshire Drive address to meet a known suspect, and after that meeting, he was observed back at the Kenshire Drive residence. (Id., PageId 691). Follow up conversations occurred on October 8, 2014 that appeared to the agent to be consistent with narcotics activity. (Id.). On October 18, 2014, intercepted communications involving Crew again appear to the agent to be consistent with narcotics activity, and after a meeting between two suspects, location data shows one suspect driving to the Kenshire Drive residence. (Id., PageId 693).

On October 20, 2014, Special Agent Giordano obtained a search warrant for the 11350 Kenshire Drive residence. (Doc. 202-1). Agents testified that while the search warrant was being executed for the Kenshire Drive residence, other agents were

surveilling the Renee Court residence, which they previously had identified as being a location where Crew's associates were located during the course of conversations relating to narcotics activity.  (Doc. 216, PageId 995; *see also* Doc. 202-1, PageId 682).  Based upon observations, agents believed that at various times narcotics and the money related thereto were in the Renee Court apartment.  (Doc. 202-1, PageId 682).  At the time, Special Agent Giordano was coordinating the investigative efforts from FBI headquarters and monitoring the phone conversations, and Special Agent Paul Herron was in the field conducting surveillance of the Renee Court address in the early morning hours.  (Doc. 216, PageId 1025-26).  During the course of their surveillance of Renee Court, agents determined that Crew was not inside.  (Id., PageId 1005).  While the residence was still under surveillance, Crew arrived at the Renee Court residence and became aware of the surveillance operation.  (Id., PageId 1006).  While in their point of observation, agents observed a car pull in directly placing its headlights on their surveillance vehicle.  (Id., PageId 1026).  Agents then removed themselves from that location and began to canvas the neighborhood for Crew and were able to confirm that he was on foot.  (Id., PageId 1027-28).  Crew contacted Brittany Snow, who was known to be in the residence, and advised her to conceal or destroy evidence in the form of a flip-phone.  (Id., PageId 1006-07).  He further advised Snow not to open the apartment door.  (Id., PageId 1008).  At this time, it was believed that Crew still was on foot in the vicinity of the Renee Court address.  (Id., PageId 1006).  Upon encountering Crew, they effected an arrest.  (Id, PageId 1028).  Agents awaited the arrival of the SWAT team to make entry into the Renee Court residence, with knowledge that Snow was inside.  (Id., PageId 1029).  At the time of the  initial entry of the Renee Court address around 7:25

a.m. on October 21, 2014, a search warrant was in process but had not been executed. (Id., PageId 1012-13). Special Agent Herron testified that the SWAT team entered the premises, arrested Snow, and secured the premises taking care to contain items in plain sight, but they did not conduct a full search of the residence. (Id., PageId 1029-30). After the safety sweep was completed, agents secured the premises and awaited the arrival of the search warrant. (Id., PageId 1031). A narcotics and weapons search was not conducted until after the obtaining of the actual search warrant itself. (Id., PageId 1035-36). The search warrant for 5869 Renee Court was obtained on October 21, 2014 at 9:03 a.m. (Doc. 202-4).

## II.   ANAYLSIS

Crew has filed three motions to suppress that raise various issues concerning the search warrants for the cellular phone ending in 0547 (Doc. 198), the Kenshire Drive residence (Doc. 200), and the Renee Court residence (Doc. 199). Those motions are addressed separately below.

### A.    Search Warrant for Cellular Phone Number Ending in 0547

Crew moves to suppress the text messages, location information, and other documents associated with the October 18, 2013 search warrants for the cellular phone number ending in 0547. (Doc. 198). He first argues that probable cause for the search warrants (Docs. 202-8, 202-9) did not exist, citing to the lack of reliability of an unnamed confidential informant, the lack of independent police corroboration of the statements of the confidential informant, and the lack of nexus between the narcotics activity and the cellular phone number to be searched or between the narcotics activity and Crew's

residence. Second, he contends that the good faith exception does not apply to preclude application of the exclusionary rule.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. To comply with the Fourth Amendment's protections, an affidavit submitted in support of a search warrant must include sufficient information to allow the court to find probable cause to justify the search and seizure. *Illinois v. Gates*, 462 U.S. 213, 239 (1983). To determine whether an affidavit establishes probable cause exists to support a search warrant, the magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." *Id.* at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *see also United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) (citing *Gates*, 462 U.S. at 239).

If the court determines that a search warrant was not issued upon probable cause and that evidence was obtained in violation of the Fourth Amendment, the court then must determine whether the evidence should be excluded. *See Illinois v. Krull*, 480 U.S. 340, 347 (1987). The exclusionary rule does not automatically apply to every Fourth Amendment violation. *Davis v. United States*, 131 S. Ct. 2419, 2429 (2011).

The relevant consideration is whether the "good-faith" exception is applicable. *United States v. Leon*, 468 U.S. 897, 909, 924-25 (1984). The good-faith exception applies when the affidavit was obtained by officers acting in objectively reasonable reliance on a search warrant that is subsequently invalidated. *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *Leon*, 486 U.S. at 918-21); *see also United States v. Wren*, 528 F. App'x 500, 503-04 (6th Cir. 2013) (considering application of the good-faith exception set forth in *Leon*); *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (same as *Wren*). The "good-faith" exception will not apply, however, when (1) the warrant is issued on the basis of an affidavit that the affiant knows (or is reckless in not knowing) contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that is cannot be reasonably presumed to be valid. *Leon*, 468 U.S. at 923; *see also Laughton*, 409 F.3d at 748.

### 1. The Affidavit did not lack probable cause due to the reliance on an unnamed confidential informant.

The Supreme Court has held that although the "veracity," "reliability" and "basis of knowledge" are important to assessing the value of information provided by a confidential informant, those considerations should not be understood as "entirely separate and independent requirements to be rigidly exacted in every case[.]" *Gates*, 462 U.S. at 230. Those considerations should instead be viewed as "closely intertwined issues that may usefully illuminate the commonsense, practical question" [of] whether there is probable cause to believe that contraband or evidence is located in a particular

place." *Id.* (internal quotations omitted). A deficiency in one of the areas therefore "may be compensated for, in determining the overall reliability of [a confidential informant's] tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. Thus, an affidavit may be supported by probable cause, even when it relies on information from an unnamed confidential informant, if the magistrate judge "was informed of some of the underlying circumstances from which the informant concluded evidence of the crime is where he claimed it would be found and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, was reliable." *United States v. Smith*, 182 F.3d 473, 478 (6th Cir. 1998); *see also United States v. Moore*, 661 F.3d 309, 313 (6th Cir. 2011) (citing *Smith*).

Here, the affidavits in their totality indicate that the confidential informant provided information on previous investigations that had been corroborated; that the confidential informant was providing the information for sentence/case consideration on a separate matter; that his criminal history includes, among others, narcotics trafficking and possession of narcotics, which are of the same type of alleged crimes for which he provided information; that several techniques, including administrative subpoenas, checks of open source data, and verification of the type of cellular service, were used to attempt to verify some of the substantive information provided; and that the verification revealed some supporting evidence based on the agent's training and experience. (Doc. 202-8, PageId 743-44; Doc. 202-9, PageId 764-64). Further, the information set forth in the affidavits that was provided by the confidential informant is detailed and specific, and is, at least in part, consistent with other information independently learned

by the agent. (*See* Doc. 202-8, PageId 742-43; Doc. 202-9, PageId 762-63). Accordingly, the Court concludes that the reliance on an unnamed confidential informant did not render the affidavits unsupported by probable cause.

### 2. The Affidavit established a nexus sufficient for probable cause.

The Fourth Amendment requires that a warrant state with particularity the place to be searched and the items to be seized. U.S. Const. amend. IV. To justify a search, the circumstances must indicate why evidence of the alleged illegal activity likely will be found in a particular place. *Gates*, 462 U.S. at 238. An affidavit therefore "must establish a nexus between the place to be searched and things to be seized, such that there is a substantial basis to believe that the things to be seized will be found in the place searched." *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir. 2010). "Probable cause has repeatedly been defined in terms of the facts and circumstances known to the officers at the time of the search." *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994). It is only necessary that an issuing officer find "reasonable grounds for belief that evidence will be found in order to justify the issuance of a warrant." *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).

Here, the following information is contained in sealed Documents 202-8 and 202-9. The agent who signed the affidavit sets forth, in sufficient detail, his training, background and experience in narcotics investigations (Doc. 202-8, PageId 738-40; Doc. 202-9, PageId 758-60) and, further summarizes his experience with gang activity and the intelligence he and other agencies have gathered on local gangs. (Doc. 202-8, PageId 739-43; Doc. 202-9, PageId 759-63). The affidavit goes on to explain how Crew

became a person of interest to law enforcement as well as the interest in alleged associates of Crew.  (Doc. 202-8, PageId 741-43; Doc. 202-9, PageId 761-63).  A confidential human source supplied agents with both suspects' cell phone numbers and indicated that those phones are used to communicate through text and talk capabilities with members of the gang and other narcotics dealers, which resulted in the obtainment of administrative subpoenas for the cellular phone ending in 0547.  (Doc. 202-8, PageId 743; Doc. 202-9, PageId 763).  That information lead to the discovery that the cell phone in question was listed under a fictitious name and the affidavits explained how similar prepaid cell service "drop phones" are used by persons dealing narcotics.  (Doc. 202-8, PageId 744; Doc. 202-9, PageId 764).  The foregoing sufficiently demonstrates probable cause to obtain information linked to that cellular phone number.

### 3.    The search warrant was not overbroad.

A search warrant "must particularly describe the things to be seized[.]"  *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001).  The description, however, "whose specificity will vary with the circumstances the case, will be valid if the description is as specific as the circumstances and the nature of the activity under investigation permit." *Id.* (internal quotations omitted); *see also United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001) ("[T]he degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought.").  The particularity requirement applies when the category of information sought is too broad in the sense that it includes items that should not be seized.  *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (citing *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999)).

To the extent Crew argues that the search warrant was overbroad and there was no evidence in the affidavit to support a location search of the cellular phone number ending in 0547, the Court disagrees. The affidavit provides a nexus between Crew and the alleged criminal activity, as set forth above. It also identifies locations where gang activity has occurred and where suspected stash houses may be located, identifies the potential connection to Crew, and identifies the reasons for the information sought to be seized and reviewed. (Doc. 202-9, PageId 761-64).

The evidence in the affidavits supports the search of cellular phone number ending in 0547. Therefore, probable cause existed and justified the search warrant of the cellular phone number as set forth in the aforesaid affidavits.

### d. Good faith

Even if the Court had determined that the search warrants were not issued upon probable cause and that evidence was obtained in violation of the Fourth Amendment, the good-faith exception set forth above would apply in this case. None of the four grounds for not applying the good-faith exception is at issue in the case at bar. Moreover, there is substantial information in the affidavits as to the underlying factual circumstances, as described above, to demonstrate that the agent acted in good faith and upon an objectively reasonable basis in obtaining and executing the search warrant. *See United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004). Accordingly, the good-faith exception would apply even if the Court had determined that the search warrants were not issued upon probable cause**.**

### B. The Search Warrant for 11350 Kenshire Drive

In the motion to suppress evidence obtained as a result of the October 20, 2014 search warrant obtained for 11350 Kenshire Drive, Crew argues that the search warrant was not supported by probable cause. (Doc. 200). Specifically, Crew contends that the search warrant did not contain a nexus between the place to be searched and the evidence to be obtained.

As explained above, the Fourth Amendment requires that a warrant state with particularity the place to be searched and the items to be seized. *Gates*, 462 U.S. at 238. Moreover, where an affidavit is submitted as the basis for probable cause in support of a search warrant, the affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause." *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) (quoting *Gates*, 462 U.S. at 239).

This affidavit contains much of the same information contained in the affidavit relating to the search of the cellular phone, including the agent's training, background and experience in narcotics and gang investigations. (Doc. 202-1, PageId 667-71). In addition, the affidavit sets forth the inter-departmental cooperation in the exchanging of information and in the handling of confidential information. (Doc. 202-1, PageId 669). The affidavit further describes the nexus between drug trafficking and various means of communications, including cellular phones (Doc. 202-1, PageId 679), and the agent's experience in analyzing information obtained therefrom (Doc. 202-1, PageId 670-71). The probable cause for the search of the Kenshire Drive address is supported in the October 20, 2014 search warrant affidavit in Paragraphs 15 through 46, and with specifics as to the connections between Crew, the Kenshire Drive address, and the suspected money laundering in Paragraphs 23 through 24 and 33 through 46. (Doc.

202-1, PageId 675-96). Confidential human source No. 1 provided information regarding Crew's large scale narcotics activities, which was corroborated through analysis on the phone numbers provided and described above, and confidential human source No. 2 likewise provided information regarding Crew, which information was likewise corroborated by a toll analysis of the phone numbers provided to case agents and through other independent investigation.

Confidential sources identified Crew as a large scale dealer as confidential source was told by his/her source that the drug supply was coming from Crew. Witness One provided information for case consideration and had previously provided federal law enforcement agencies information considered to be reliable. Witness One's background indicated that he/she was involved in the drug trade and had purchased narcotics from Crew in the past. (Doc. 202-1, PageId 678-79).

As described above, the affidavit provides that on February 4, 2014, agents followed a suspect from Rubicon Place to the Kenshire Drive address and observed the suspect enter the residence of Crew empty-handed. Thereafter, the suspect exited the residence carrying a plastic shopping bag. The suspect returned to his residence where he engaged in the hand-to-hand exchange with a driver of a blue Toyota pick-up truck, which resulted in the plastic bag being placed in the truck. A motor-vehicle stop by local law enforcement enabled the officers to identify the driver of that vehicle and recover $80,000 in U.S. currency. After the stop of the Hispanic male, officers continued their surveillance of the suspect and observed him leave his residence at 2035 Rubicon with a package that he had retrieved from the back seat of the blue Toyota pick-up truck. He then drove to 7943 Glen Orchard Drive, Cincinnati, Ohio, a location previously identified

as a stash house.  At approximately 1:31 P.M., a vehicle driven by Charles Pride arrived at the location whereupon he entered the residence and moments later exited with what appeared to be a duffle bag.  During the time of this transaction he was in telephonic contact with Crew.

The affidavit further sets forth activity on September 27, 2014 on cellular phones of Crew and another target telephone relating to what the agent's experience indicated was consistent with narcotics transactions and activity, at which time Crew was identified as being at the Kenshire Drive residence.   Additional intercepted communications on October 6, 2014 through October 8, 2014 similarly were interpreted, based on the agent's experience, to reflect narcotics activity, and Crew was observed during the course of the intercepted communications leaving the Kenshire Drive residence and returning immediately to the Kenshire Drive address after the meeting with a known source.   Further, on October 18, 2014, intercepted communications continued to indicate to the agent the occurrence of narcotics transactions and activity involving Crew, after which one target suspect was observed using location data driving directly to the Kenshire Drive residence.

The agent provided a detailed summary of the probable cause for the search warrants of the Kenshire Drive residence in Paragraph 48 of the affidavit, which included information set forth and described previously in the same affidavit, as well as the stop described earlier wherein on February 4, 2014, agents observed what they believed to be U.S. currency leaving the Kenshire Drive residence in a vehicle driven a suspect to 2035 Rubicon Place where it was traded for cocaine.

Further, Paragraph 12(b) of Document 202-1 identified the Kenshire Drive residence as the home of Crew. This address was placed under physical surveillance and, based upon the transactions described above, the information obtained from the cellular phones, and the information obtained from confidential human sources 1 and 2 and witness 1, the reliability of all three of which was sufficiently documented in Paragraphs 9 through 21, combined with the active surveillance described in Paragraphs 23 and 24 and the active surveillance and intercepted communications in Paragraphs 33 through 46, sufficiently demonstrates the required probable cause for a search warrant of the Kenshire Drive residence. *United States v. Brown*, 732 F.3d 569, 573-74 (6th Cir. 2013) (*citing United States v. Greene,* 250 F.3d 471, at 480 (6th Cir. 2001)); *see also United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (en banc).

### C. The search warrant for 5869 Renee Court, Apt. 7

In the motion to suppress evidence obtained from 5869 Renee Court, Apartment 7, Crew argues that the evidence was obtained without a warrant such that the search was a clear violation of his Fourth Amendment rights. (Doc. 199, PageId 644). Specifically, Crew contends that the search warrant obtained on October 21, 2014 at 9:03 a.m. was obtained only after the search of the Renee Court residence.

Although warrantless entries into a person's home are presumed to be unreasonable under the Fourth Amendment, *Groh v. Ramirez,* 540 U.S. 551, 559 (2004), the Supreme Court consistently has held that certain exigent circumstances may justify a warrantless entry, *see Kentucky v. King*, 131 S. Ct. 1849 (2011). One instance giving rise to exigent circumstances is the imminent destruction of evidence. *Georgia v. Randolph*, 547 U.S. 103, 117 (2006). In drug cases specifically, exigency

may arise from the danger of destruction of evidence of drug crimes. *United States v. Elkins*, 300 F.3d 638, 655 (6th Cir. 2002) (citing *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1511 (6th Cir. 1988)). To demonstrate the existence of an exigency, the government must show there was: (1) a reasonable belief that third parties are inside the dwelling; and (2) a reasonable belief that the loss or destruction of evidence is imminent. *Id.* at 656. Further, all that is required is proof of "someone" in the house who might destroy the evidence. *United States v. Campbell*, 261 F.3d 628, 631 (6th Cir. 2001).

Here, the agents had a sufficient factual basis to reasonably believe that Snow was inside the Renee Court residence and that the loss or destruction of evidence was imminent. As described above in the Background Facts, the agents had connected Crew, Snow, and the Renee Court residence to their investigations of illegal narcotics activity. While the Renee Court residence was under surveillance as part of the investigation, Crew arrived at the Renee Court residence and became aware of the surveillance operation. Crew then contacted Snow and discussions indicated to the agents that she was inside the home. Agent testimony confirmed that they knew Snow was inside the home. Further, the intercepted conversations indicated that Crew had advised Snow to conceal or destroy evidence in the form of a flip phone and not to open the apartment door. The facts support the initial warrantless entry into the home.

Unlike the Court's recent decision in *United States v. Williams*, Case No. 1:14cr118, 2015 U.S. Dist. LEXIS 81907 (S.D. Ohio June 24, 2015), the officers in the instant case did not create the exigent circumstances but rather responded to the cell

phone conversation between Crew and Snow. In such circumstances, a warrantless entry is appropriate. *Roaden v. Kentucky*, 413 U.S. 496, 505 (1973).

Moreover, the evidence presented, including the testimony of the agents, supports a finding that only a protective sweep was conducted prior to the obtainment of the search warrant. A "protective sweep" is a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). It extends only to a cursory inspection of places where an individual may hide and lasts "no longer than is necessary to dispel the reasonable suspicion of danger[.]" *Id.* at 335-36. Special Agent Herron testified that the protective sweep occurred after the arrest of Snow in the Renee Court residence and lasted five to ten minutes. (Doc. 216, PageId 1045). Photographs as to the status of the home after the protective sweep were taken by Special Agent Herron. (Id., PageId 1052-53). After the protective sweep and after the photographs were taken, the testimony and other evidence supports a finding that the agents waited at the threshold of the door before searching the home. (Id., PageId 1031, 1053). The evidence and reasonable inferences therefrom show that the protective sweep occurred after the arrests of Crew outside the residence and of Snow inside the residence, after the SWAT team encountered a loaded firearm in plain view upon entry, and with knowledge of prior narcotics activity possibly occurring at the residence. The protective sweep thus was not improper. *Buie*, 494 U.S. at 327; *United States v. Taylor*, 248 F.3d 506, 513-14 (6th Cir. 2001). Further, none of the information observed in the protective sweep was incorporated in the affidavit used to support the subsequently obtained search warrant, which was sought prior to the protective sweep and obtained shortly thereafter.

Any evidence obtained from the protective sweep also is subject to the independent source or inevitable discovery doctrine, as the search warrant was issued within a short time after the protective sweep.  *See Murray v. United States*, 487 U.S. 533, 538-40 (1988); *United States v. Straughter*, 950 F.2d 1223, 1231 (6th Cir. 1991).

Accordingly, the evidence obtained from the Renee Court address will not be suppressed.

III.  **<u>CONCLUSION</u>**

Consistent with the foregoing, Crew's motions to suppress (Docs. 198, 199, 200) are **DENIED**.

**IT IS SO ORDERED.**

<u>s/Michael R. Barrett</u>
JUDGE MICHAEL R. BARRETT
UNITED STATES DISTRICT COURT